Filed 11/19/20  P. v. Rico CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D074546 |
| Plaintiff and Respondent, | (Super. Ct. No. SCD266403) |
| v. | |
| AARON DAVID RICO III et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed, Smith's sentence vacated and remanded for resentencing.

Christian Buckley, under appointment by the Court of Appeal, for Defendant and Appellant Aaron David Rico III.

Anthony Dain, under appointment by the Court of Appeal, for Defendant and Appellant Thomas James Smith.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson., and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

Aaron David Rico III and Thomas James Smith (together appellants) and their cohorts conspired to rob and burglarize numerous homes on different nights. A jury convicted each appellant of: one count of conspiracy to commit first degree burglary (count 4; Pen. Code, § 182, subd. (a)(1))[1]; four counts of conspiracy to commit first degree burglary and robbery (counts 6, 11, 16, 20; § 182, subd. (a)(1)); 12 counts of first degree robbery in concert (counts 8, 9, 10, 14, 18, 19, 22, 23, 24, 26, 27, 28; §§ 212.5, subd. (a), 213, subd. (a)(1)(A)); eight counts of first degree burglary (counts 5, 7, 15, 17, 21, 25, 29, 30; §§ 459, 460, subd. (a)); forcible sexual penetration (count 12; § 289, subd. (a)); and assault with intent to commit forcible sexual penetration during a first degree burglary (count 13; § 220, subd. (b)).

The jury also found Smith guilty of conspiracy to commit residential burglary (count 1; § 182, subd. (a)(1)) and two counts of first degree burglary (counts 2 and 3; §§ 459, 460, subd. (a)). As to certain counts, the jury found true various enhancements. Smith later admitted the truth of two prior strikes and one prior serious felony allegation, as well as the allegation that he was on felony probation during the crimes. The trial court dismissed one of Smith's prior strikes under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*). The court sentenced Smith to a determinate sentence of 85 years and four months, and an indeterminate sentence of 50 years to life. The court sentenced Rico to a determinate sentence of 35 years, and an indeterminate sentence of 25 years to life.

Appellants contend that counts 11 to 15 relating to one of the robberies should be reversed based on alleged *Brady*[2] error. Rico contends that the

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    *Brady v. Maryland* (1963) 373 U.S. 83.

evidence does not support his robbery convictions on counts 10 and 24. He also argues that the trial court erred by failing to hold an ability to pay hearing with respect to the fines and fees assessed at sentencing. Smith asserts that the court violated his Sixth Amendment right to a jury trial by using a juvenile adjudication to enhance his sentence. He also argues that his case should be remanded to allow the trial court to decide whether to exercise its newly-conferred discretion to strike the five-year sentence enhancement imposed for a prior serious felony conviction.

We agree that Smith's sentence should be vacated and his matter remanded to allow the trial court to decide whether to strike the five-year sentence enhancement for his prior serious felony conviction. We otherwise reject appellants' arguments and affirm their convictions.[3]

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

We forego a detailed recitation of the facts and instead briefly summarize the nature of appellants' crimes. The discussion provides additional factual background related to the specific crimes at issue in this appeal.

---

[3]    Rico claims that his arguments regarding his robbery convictions and ability to pay the fines and fees apply equally to Smith. However, Smith made no arguments regarding his robbery convictions or his ability to pay fines and fees, nor did he join in Rico's arguments. "Instead of filing a brief, or as part of its brief, a party may join in or adopt by reference all or part of a brief in the same or a related appeal." (Cal. Rules of Court, rule 8.200(a)(5).) Rico cites no authority allowing him to join Smith to the arguments in Rico's brief and we have found none. Accordingly, we disregard the purported joinder.

In early 2016,[4] a series of home burglaries and robberies occurred on six days in San Diego County. Detectives investigating the crimes dubbed the suspects the "Open Door Bandits" because they always entered through unlocked or open doors. The victims stated that the suspects were of different races, something the police considered unique. The suspects typically used zip ties, shoelaces, and scarves to tie up the residents. The suspects took jewelry, money, personal electronics and gaming systems. Briefly, the crimes were as follows:

January 24 home burglary (counts 1, 2)

January 24 home burglary (counts 1, 3)

January 26 home burglary (counts 4, 5)

January 29 home robbery and burglary (counts 6-10)

January 31 home robbery, burglary and sexual assault (counts 11-15)

February 5 home robbery and burglary (counts 16-19)

February 11 home robbery and burglary (counts 20-24)

February 11 home robbery and burglary (counts 25-28)

February 11 home burglary (count 29)

February 11 home burglary (count 30)

Crime scene evidence ultimately led to appellants' arrests and the arrest of their five cohorts: Stephen Gomez, Robin Shawver, Aaron Rico V, Victor Harvey and Jordan Wilson.[5] Appellants' cohorts pleaded guilty to various charges. Appellants were tried before a single jury.

---

[4]    All undesignated date references are to 2016.

[5]    We refer to appellant as Rico, and Aaron Rico V as Rico V.

During closing argument, Smith's counsel conceded his client's guilt on all charges except counts 11 to 15, the incident where the victim, Jane Doe, was sexually assaulted by a Black man.[6] During closing argument, Rico's counsel essentially conceded his client's guilt for aiding and abetting the crimes, claiming that Rico acted as a lookout for all of the charged offenses and only went inside the homes for the crimes that occurred on February 11. Counsel argued however, that Rico did not aid and abet the sexual assault because the assault was not foreseeable. The jury rejected these arguments and convicted appellants of all charges, including the incident involving the sexual assault.

## II.

## DISCUSSION

A. *Appellants Did Not Establish all Elements of a Brady Violation*

    1. Additional Background

    a. January 31 - Jane Doe (Counts 11-15)

In the early morning hours of this day, Doe woke up to noises and heard a man tell her to get down and be quiet. She was not wearing her glasses or contact lenses. She could see about 12 to 18 inches in front of her and beyond that her vision was "pretty blurry." With the covers over her head she heard two voices speaking to her. When Doe pulled her head out from under the covers she saw a man who might have been Hispanic holding jewelry. This man wore black gloves, a black hoodie, and black pants. She then described a man wearing a white hoodie and black pants who held up the keys to her van and told her they were not going to take it.

Eventually a third man wearing dark clothes, a dark bandana, and thick dark-rimmed glasses told her to pull back her bed covers because he

---

[6]    Smith is a Black man.

wanted to see what she looked like. This man appeared to be Hispanic or Asian. Another man then entered the room and told her that they were going to tie her hands. As the man tied her hands she glanced up at him. The man was Black, wore a dark hoodie and may have had a black bandana on his face.

The Black man tied a scarf over her eyes and later told her to take her clothes off. The Black man cut the shoelace binding her hands and pulled the scarf down to her neck. Doe undressed and heard the men talking about her body. She described seeing three sets of legs, but said there might have been a fourth person outside her vision. The men told her to get on the bed and had her change positions several times. The Black man re-tied her hands together and someone put a pillow case over her head. She felt hands on her body. The Black man told her to lay on her back and spread her legs. When she protested, someone pressed a gun to her arm and told her to be quiet. She felt two fingers penetrate her vagina and the gun against her arm. She did not know who had sexually assaulted her "[b]ut based on where everyone was, [she assumed] it was the Black guy." The men had her shower and then left.

b. February 5 - James M. and Betsy H. (Counts 16-19)

In the early morning hours on this day, three men entered the home belonging to James and Betsy. One of the men carried a gun. After one man bound James's and Betsy's hands, the men moved the couple into a home office, closed the double French doors to the office, and tied the doors together. James could not see the men's faces. Betsy did not see the men's skin tone, but believed they were either Hispanic or Black based on their voices.

6

The men left with cash, the couple's wallets, electronic equipment, two cell phones, and jewelry. Later in the day, Michael J. found Betsy's wallet in the middle of the street near a Mira Mesa shopping center. The shopping center contained a store where some items stolen in the robbery series had been pawned. After looking inside the wallet, Michael took it to a police station. The wallet contained Michael's DNA.

c. Trial Court Proceedings

On May 31, 2018, following the close of evidence and while the jury was deliberating, the prosecutor learned that the crime lab had matched another Black man's DNA to Betsy's wallet. The prosecutor explained that initial testing of the wallet in 2016 revealed a complex mixture of DNA that the crime lab computers could not interpret at that time. In March 2018, the crime lab upgraded their computers which were then able to interpret the results. The crime lab used the new results to identify A.B., who was an African-American male and not one of the seven suspects in the case, as a contributor to the DNA found on the wallet.

On May 7, 2018, the Department of Justice sent a letter to Brian B. in the San Diego Police Department Forensic Section with the new DNA results showing that DNA belonging to A.B., a Black man, was found inside the wallet. That same day, Brian learned of a family emergency. Although he attempted to perform his job duties that day, including forwarding the new information to the detective in this matter, Brian was emotionally distraught and distracted. Brian was absent from his work for about one month attending to his family emergency. On May 31, 2018, Brian realized that he had failed to forward the information to the detective. Brian forwarded the information that day and the prosecutor immediately informed the court and defense counsel.

A.B. lived within half a mile of the location of the discarded wallet. A.B. had prior arrests and convictions for both burglary and robbery. Further investigation failed to yield any connection between A.B. and the other individuals in the case.

After the jury returned its verdicts, appellants moved for a new trial based on the prosecution's failure to disclose exculpatory evidence as required by *Brady*. The prosecutor acknowledged that the prosecution team possessed the potentially favorable new information and that it was not disclosed prior to or during trial. She argued that the evidence was not material and that appellants suffered no prejudice. The trial court agreed that the DNA evidence was favorable to the defense, was possessed by the People prior to the start of jury selection and was improperly and inadvertently withheld by the People. It concluded, however, that appellants were not prejudiced by the failure to disclose the evidence. The trial court explained that no evidence connected A.B. to Doe's incident and that "overwhelming" evidence existed regarding appellants' guilt as to the Doe incident.

2. Analysis

Appellants contend that their convictions for the Doe incident (counts 11 to 15) must be reversed based on *Brady* error. As we shall explain, after considering the withheld DNA evidence, we conclude that it was not material under *Brady* and that appellants received a fair trial.

Under *Brady*, *supra*, 373 U.S. 83, the state is required to disclose to the defense any material, favorable evidence. (*Id.* at p. 87.) "There are three elements to a *Brady* violation: (1) the state withholds evidence, either willfully or inadvertently, (2) the evidence at issue is favorable to the defendant, either because it is exculpatory or impeaching, and (3) the evidence is material." (*People v. Lewis* (2015) 240 Cal.App.4th 257, 263.)

8

Here, the prosecutor conceded that the first and second elements of a *Brady* violation occurred—the DNA evidence was favorable to the defense and the prosecution withheld the evidence. Accordingly, we focus on the third element, materiality.

" '[S]trictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043 (*Salazar*).) A " 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court." (*Id.* at p. 1050.) It is the defendant's burden on appeal to show a reasonable probability—not merely a reasonable possibility—of a different result. (*Strickler v. Greene* (1999) 527 U.S. 263, 291.) The issue is not whether it was more likely than not the defendant would have received a different verdict. (*Smith v. Cain* (2012) 565 U.S. 73, 75.) Instead, we ask if the likelihood of a different result was great enough to undermine confidence in the outcome of the trial. (*Ibid.*) *Brady* claims present a mixed question of law and fact and "are subject to independent review" on appeal, with the trial court's findings of fact, if any, "entitled to great weight when supported by substantial evidence." (*Salazar*, at p. 1042.)

a. Smith did not establish a *Brady* violation

Smith notes that he conceded his guilt on all crimes except the crimes involving Doe, no DNA evidence connected him to the crimes against Doe, and Doe only identified a Black man, not him, as her assailant. Additionally, defense counsel argued during closing that another Black man was involved in the crimes against Doe, emphasizing that Smith's DNA was found at all the crime scenes except Doe's. He asserts that the new evidence could have

9

created reasonable doubt in the minds of one or more jurors regarding his participation in the crimes against Doe.

To determine whether the new DNA evidence created a reasonable probability of a different result we examine the evidence presented at trial against Smith. This evidence included Shawver's testimony, surveillance video from a neighbor of Doe, holding cell conversations between the suspects, mobile phone evidence and DNA evidence. We detail this evidence below.

### i. Shawver's testimony

Shawver testified against Rico and Smith regarding these charges. Shawver dated Rico's brother, Rico V. Smith knew the Rico brothers and regularly socialized with them. Smith dated the Rico brothers' sister. Shawver and cohort Gomez were good friends. Gomez was also friends with the Rico brothers and Smith. Shawver met cohort Harvey through the other men. Gomez frequently borrowed Shawver's car, a white Nissan Sentra.

On January 31, Gomez, Rico, Rico V, and Smith picked Shawver up in her car after she got off work. They went to the street where Doe's home was located. Someone drove Harvey's Volkswagen Passat that evening to the same area. Shawver fell asleep in the car. When she woke up, she saw Gomez, Rico, Rico V and Smith walking away together. Shawver stayed in the car texting one of her friends. About one hour later, the four men came running back. They all got into Shawver's car and drove away, leaving Harvey's car at the scene. The men did not discuss what had occurred and Shawver did not see anything in their hands.

### ii. Surveillance video

A neighbor's surveillance cameras captured events occurring on the night of Doe's sexual assault. The surveillance video corroborated Shawver's

10

testimony, showing two cars driving down Doe's street at about 1:00 a.m. Police determined that one of the suspect's cars was an older model, white Nissan or Toyota and the other car was a grey or silver Volkswagen.

The video then showed two individuals wearing hoodies and white sneakers approach the neighbor's truck. These individuals then walked towards Doe's house. Later, four individuals could be seen running down the street away from the area of Doe's house. One car then left the neighborhood, which also corroborated Shawver's testimony that all the men left in her car. One individual was wearing light colored pants and a dark top, one individual was in dark pants with a lighter colored jacket or shirt, and two individuals were wearing light tops and dark pants.

### iii. Holding cell conversations

After their arrests, police placed all seven suspects together at various times in the same holding cell and recorded their conversations. These conversations further corroborated Shawver's testimony. A conversation between Smith and Gomez referenced the sexual assault that took place at Doe's Sorrento Valley home:

"SMITH: They don't have any evidence, bro. What . . . type of evidence do they have? They have to find the shit on you bro.

"GOMEZ: *Well that's funny 'cause they described us from the Valley incident too.*

"SMITH: What did they say?

"GOMEZ: Very detailed.

"SMITH: What did they say?

"GOMEZ: And they put it down as if I had said it.

"SMITH: What did they say?

"GOMEZ: Exactly what happened.

11

"SMITH:  What happened?  What'd they say?

"GOMEZ:  *The whole finger incident and her in the shower.*

"SMITH:  Ah, that's it?"  (Italics added.)

A conversation between Smith and Shawver mentioned the video evidence regarding the Doe incident:

"SMITH:  Yeah but you say-you seen the video, right?

"SHAWVER:  No it didn't show faces.

"SMITH:  What did you see, just the running part or what?

"SHAWVER:  My car.

"SMITH:  Oh that was there?

"SHAWVER:  Mm-hmm.  Mine and [Harvey's]."

> iv.  Cell phone evidence

Cell phone records suggested that Shawver and Smith were together on the day of Doe's sexual assault and that Smith and Gomez were together after the assault.  On January 31, Shawver's and Smith's cell phones connected to cell towers which were near each other at 12:44 a.m. in the "UTC La Jolla area" and approximately four to five miles from the crime scene.  Between 1:10 a.m. and 1:30 a.m., Shawver's phone connected multiple times to a tower just over one mile away from the crime scene.  Shawver was texting during that time period.

Smith's cell phone, however, was not activated again until 3:14 a.m. when it connected to a tower in Mira Mesa.  At 3:14 a.m. and 3:17 a.m., Gomez's phone connected to the same cell tower as Smith's.  Gomez and Smith called each other at 3:17 a.m. and 3:19 a.m. and their phones connected to the same tower.

12

v. DNA evidence

The scarf used to cover Doe's eyes contained Gomez's DNA. The Doe crime scene did not contain any of the other suspects' DNA. The shoelaces used to tie up Betsy or James contained Smith's DNA. James's and Betsy's home contained no DNA from the other suspects. Police found Smith's DNA at every crime scene except Doe's and one of the February 11 crime scenes.

vi. The withheld DNA evidence was not material

Smith contends that the DNA evidence found on Betsy's wallet, which had been discarded on a public street days after the crimes against Doe, raised a reasonable probability that the Black man who sexually assaulted Doe was not him, but A.B. After our independent review, we agree with the trial court's conclusion that overwhelming evidence existed regarding Smith's guilt for the crimes against Doe and conclude that he was not prejudiced by the failure to disclose the DNA evidence.

Shawver's testimony connected Smith to Doe's crimes. The trial court described Shawver's testimony as "very compelling." Cell phone records corroborated Shawver's account of the evening and suggested that Shawver, Smith and Gomez were together that evening. Gomez's DNA on Doe's scarf and video surveillance from Doe's neighbor further corroborated Shawver's testimony. More importantly, the holding cell conversations Smith had with Gomez and Shawver show that Smith knew important details about Doe's crimes. Since there is no reasonable probability that the result of the trial would have been different had the DNA evidence been disclosed before trial, it was not material. (*Salazar*, *supra*, 35 Cal.4th at p. 1043.)

b. Rico did not establish a *Brady* violation

Rico contends that a reasonable probability existed that the new DNA evidence would have changed the outcome of the charges against him for the

13

Doe incident because it supported his argument that he was the lookout and not one of the four men inside Doe's residence. He reasons that if he was outside Doe's residence he could not be guilty of the sex crimes under a natural and probable consequence theory of guilt.

As a preliminary matter, out of the seven suspects Smith was the only Black man. Thus, even assuming A.B. participated in the crimes against Doe and not Smith, this fact would not have furthered Rico's argument that he was not the fourth person in the home. Shawver's testimony established that Rico did not remain by the car as a lookout. She testified that Rico was one of the four men who left her car and then came running back on the night of Doe's home invasion and sexual assault.

Rico's argument that his DNA was not found inside Doe's home fails to advance his position. The scarf placed over Doe's head contained Gomez's DNA, but none of the other items tested from Doe's home contained the DNA of any of the other suspects, including Rico. The DNA expert explained that there are a variety of situations where a person touches an item—for example, while wearing gloves—without leaving DNA. Notably, Doe testified that the Black man and a man dressed in all black clothing wore gloves. She also believed that the man in the white hoodie wore gloves, but could not see the hands of the Asian or Hispanic man.

Rico has not shown that the withheld DNA evidence would have put the case against him in such a different light as to undermine confidence in the verdict on the charges against him pertaining to Doe. (*Salazar*, *supra*, 35 Cal.4th at p. 1050.)

B. *Substantial Evidence Supports Rico's Robbery Convictions on Counts 10 and 24*

1. Additional Background

a. January 29 - Burglary and Robbery (Count 10)

On this day, Thuy H. and Dang N. slept in their bedroom when they were startled by commands to wake up. They saw three men with their heads covered holding guns pointed towards them. Someone asked for money and jewelry. One man tied Thuy's feet and her hands, and gagged her with a scarf. Another man tied Dang's hands behind his back and covered Dang's head with a t-shirt. The men searched the home for approximately 60 minutes and ultimately found hidden gold, jewelry and cash.

The couple's daughter, M.N., and their two grandsons were asleep in another bedroom. M.N. woke up when one of the men tried to open her bedroom door, but she had the door locked from the inside. She heard talking and the sounds of items being moved. She opened the door and looked downstairs where she saw her father being held at gunpoint with his hands tied and head covered. At that moment, one of the men saw M.N. and ordered her to stop. The man had a gun and was about six to 10 feet away from her. She ran into her room, locked her door and called 911. The men left shortly after M.N. saw them. None of M.N.'s property was stolen. The jury convicted appellants of three counts of robbery, counts 8, 9, 10 pertaining to Thuy, Dang and M.N.

b. February 11 - Burglary and Robbery (Count 24)

On this day, Thomas B. slept in the upstairs master bedroom of his home with his wife, Gina. His two sons were asleep in their upstairs bedrooms. Thomas heard his dog barking and growling. He got up to investigate and found a man wearing a hoodie and a headlamp outside his bedroom door. As Thomas started yelling he saw another man run out of his

15

youngest son's bedroom, and a third man near his older son's bedroom. One of the men subdued Thomas at gunpoint.

Gina also woke up when she heard the dog barking. After Thomas opened their bedroom door she knew from the tone of his voice that strangers were in their home. Gina ran into the hall where she saw her older son, John Doe, leaving his bedroom. She called 911 after she heard Thomas yell, "'Don't shoot.'" She shouted for John Doe to call 911 and told him to hide when she saw a one of the intruders coming up the stairs.

Gina ran into her younger son's bedroom and tried to close the door as one of the intruders pushed on the door. The pair struggled over the door for almost a minute until the man gave up and the house quieted. After hiding her sons in the master bedroom, Gina went down stairs and found Thomas lying on the floor. Thomas told her that the men had left and taken her purse.

John Doe testified about what he saw that night. He woke up to his dog barking and his dad yelling. From his open bedroom door he saw what appeared to be headlights moving frantically. He called the police in response to his mother's request and walked into the hallway. When he looked over the banister he saw his father on the floor and some people running around. A man stood over his father with a gun. He saw three men in his home, all wearing black.

A person ran by his door and that person struggled to enter his brother's bedroom. This person also had a gun. His mother then came to his room and had him hide in the master bedroom with his brother. The intruders took none of John Doe's property and nothing in his bedroom had been moved. The jury convicted appellants of three counts of robbery, counts 22, 23, 24 pertaining to Thomas, Gina and John Doe.

2. Analysis

Rico contends that the evidence does not support his robbery convictions on counts 10 and 24 pertaining to M.N. and John Doe. He acknowledges that these household members witnessed actions taken toward their parents. However, he argues that (1) the property was not possessed by these victims or taken from their person or immediate presence, and (2) the takings were not accomplished by force or fear.

To determine the sufficiency of the evidence, "we review the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible and of solid value, from which a rational trier of fact could find that the elements of the crime were established beyond a reasonable doubt." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.) We must "view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Lewis* (1990) 50 Cal.3d 262, 277.) It is not our function to reweigh the evidence (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), and reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) Reversal of a conviction for insufficient evidence is only required if under no hypothesis whatever is there substantial evidence to support the conviction. (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

The elements of robbery are (1) the taking of personal property (2) from a person or the person's immediate presence (3) by means of force or fear and (4) with the intent to permanently deprive the person of the property. (§ 211; *People v. Marshall* (1997) 15 Cal.4th 1, 34.) "The fear mentioned in Section 211 may be either: [¶] 1. The fear of an unlawful injury to the person or

17

property of the person robbed, or of any relative of his or member of his family; or,  [¶]  2. The fear of an immediate and unlawful injury to the person or property of anyone in the company of the person robbed at the time of the robbery."  (§ 212.)

"Fear may be inferred from the circumstances in which a crime is committed or property is taken."  (*People v. Holt* (1997) 15 Cal.4th 619, 690.)  The victim's fear need not be extreme.  (*People v. Davison* (1995) 32 Cal.App.4th 206, 216.)  "[T]he requisite force or fear need not occur at the time of the initial taking.  The use of force or fear to escape or otherwise retain even temporary possession of the property constitutes robbery."  (*People v. Flynn* (2000) 77 Cal.App.4th 766, 772.)  "So long as the perpetrator uses the victim's fear to accomplish the retention of the property, it makes no difference whether the fear is generated by the perpetrator's specific words or actions designed to frighten, or by the circumstances surrounding the taking itself."  (*Ibid*.)  Whether force or fear exists is a question for the trier of fact.  (*People v. Mungia* (1991) 234 Cal.App.3d 1703, 1707.)

"[N]either ownership nor physical possession is required to establish the element of possession for the purposes of the robbery statute.  [Citations.] '[T]he theory of constructive possession has been used to expand the concept of possession to include employees and others as robbery victims.'  [Citation.] Two or more persons may be in joint constructive possession of a single item of personal property, and multiple convictions of robbery are proper if force or fear is applied to multiple victims in joint possession of the property taken."  (*People v. Scott* (2009) 45 Cal.4th 743, 749-750 (*Scott*).)

a.  The takings were accomplished by force or fear

The evidence supported the jury's implied finding that the requisite force or fear existed as to both M.N. and John Doe.  The trial court instructed

18

the jury with CALCRIM No. 1600 on robbery.  The instruction informed the jury that, to support a robbery conviction, the People were required to prove, beyond a reasonable doubt, that the "defendant used force or fear to take the property or to prevent the person from resisting . . . ."  (CALCRIM No. 1600.)  The instruction further informed the jury that "[f]ear, as used here, means fear of injury to the person himself or herself, or injury to the person's family or property."  (CALCRIM No. 1600, italics deleted; § 212.)

Turning first to M.N., the evidence shows that one of the intruders tried to enter her room, but was thwarted by her locked door.  After M.N. opened her door, she observed her father sitting on the stairs at gunpoint with his head covered and hands behind his back telling one of the men that he had no money.  M.N. ran to her bedroom and locked the door after one of the intruders saw her and told her to stop.  M.N. was scared because the man was about six to 10 feet away from her and carried a gun.  The circumstances of the robbery reasonably produced fear in M.N. for her own safety, and that of her father.

Similarly, during the robbery at John Doe's home, John Doe looked downstairs and saw his father lying face down on the floor.  A man stood over his father's head holding a gun.  John Doe felt scared and confused.  After John Doe returned to his bedroom to hide, he saw a person run by his open door.  John Doe saw the man try to force his way into his brother's bedroom where his mother and brother hid.  This man also held a gun.  During this entire time, John Doe's mother was screaming.  These circumstances reasonably produced fear in John Doe for the safety of his father, mother and brother.

In both robberies, the force applied to the victim's family members and the fear caused by the robbers' actions, allowed the robbers to accomplish the

taking and escape with the property. (See *People v. Prieto* (1993) 15 Cal.App.4th 210, 211, 215-216 [substantial evidence that appellant's forceful taking of purses of two victims—one of whom held the purses in her lap, and the other of whom witnessed the act from a distance and yelled at appellant to stop—supported two counts of robbery; victim who witnessed robbery from a distance was "fearful and shocked" and thus "less inclined or able than she otherwise would have been to prevent appellant from taking her purse"].) Thus, we conclude, that M.N. and John Doe were robbery victims.

b.  These family members constructively possessed the stolen property under the special relationship doctrine

Rico notes that the property taken from M.N.'s home consisted of her mother's purse and items taken from her parents' closet. He argues that M.N. was not in the master bedroom, nor did she have any possessory interest in the stolen property. In the John Doe robbery, the men took Thomas's wallet, cell phone and tablet reader, Gina's purses and a bag of quarters. Rico similarly contends that John Doe was not near the stolen property, nor did he have the right to possess this property. He asserts that we should decline to follow *People v. Hutchinson* (2018) 20 Cal.App.5th 539 (*Hutchinson*), a case applying the concepts of robbery to a child in a home with her parents. Rico expresses doubt whether California law recognizes family-owned property. Even if this theory is valid, he contends *Hutchinson* is distinguishable because M.N. and John Doe were not subjected to any force or fear, and an item had been stolen from the child in *Hutchinson*.

Any person who owns or who exercises direct physical control over, or who has constructive possession of, any property taken may be a victim of a robbery if force or fear is applied to such person. (*Scott, supra*, 45 Cal.4th at pp. 749-750.) "For constructive possession, courts have required that the alleged victim of a robbery have a 'special relationship' with the owner of the

20

property such that the victim had authority or responsibility to protect the stolen property on behalf of the owner." (*Id.* at p. 750.) "By requiring that the victim of a robbery have possession of the property taken, the Legislature has included as victims those persons who, because of their relationship to the property or its owner, have the right to resist the taking, and has excluded as victims those bystanders who have no greater interest in the property than any other member of the general population." (*Id.* at pp. 757-758.)

Civil Code section 50 establishes the right to use "necessary force" to protect the "property of oneself, or of a spouse, child, parent, or other relative, or member of one's family." "Two or more persons may be in joint constructive possession of a single item of personal property, and multiple convictions of robbery are proper if force or fear is applied to multiple victims in joint possession of the property taken." (*Scott, supra*, 45 Cal.4th at p. 750.) Accordingly, the single taking of property, by force or fear, from the joint possession of more than one victim will support multiple robbery convictions. (*People v. Ramos* (1982) 30 Cal.3d 553, 587 (*Ramos*), reversed in part on other grounds in *California v. Ramos* (1983) 463 U.S. 992.)

*Hutchinson* is a case applying the concepts of robbery to a child present in a home with her parents and other family members at the time of the home invasion. (*Hutchinson, supra*, 20 Cal.App.5th at pp. 543-545, 549.) Although the *Hutchinson* court observed that the child's watch had been stolen, it concluded that the child had constructive possession of the property stolen from the family based on the family relationship. (*Id.* at p. 549.) The *Hutchinson* court found "no rational basis to conclude that a minor's constructive possession of or possessory interest in her family's property is nonexistent if majority members of her family are present. . . .  The forcible

21

taking of family-owned (parents or siblings) property impacts both children and adults within a family unit." (*Ibid.*)[7]

Applying these principles here, the evidence supports the jury's robbery finding as to both M.N. and John Doe, who were household family members at the time of the home invasions. Civil Code section 50 establishes the right to use "necessary force" to protect the property of oneself, a parent or other relative. Under this statute, M.N. and John Doe had the authority to protect the stolen property, and thus had constructive possession of it. Both family members tried to protect the property in the home by calling 911. We agree with *Hutchinson, supra*, 20 Cal.App.5th at p. 549, that the presence of M.N.'s and John Doe's parents did not divest these family members of their statutory authority to protect, or their constructive possession of, their parent's property. Where, as here, force or fear is applied to multiple victims

---

7 Notably, the California Jury Instructions, Criminal (CALJIC) created a new instruction based on *Hutchinson, supra*, 20 Cal.App.5th 539, which provides: "Robbery requires among other things that the victim be in possession of the property stolen. There are two kinds of possession: actual possession and constructive possession. Actual possession requires that a person knowingly exercise direct physical control over a thing. [¶] Constructive possession does not require actual possession, but does require that a person knowingly exercise control over or the right to control a thing, either directly or through another person or persons. [¶] [Two or more persons may be in joint constructive possession of a single item of personal property, and multiple convictions of robbery are proper if force or fear is applied to multiple victims in joint possession of the property taken.] [¶] Constructive possession only requires that there be some type of special relationship with the owner of the property sufficient to demonstrate the victim had authority or responsibility to protect the stolen property on behalf of the owner. The victim need not have general authority to control the owner's property in other circumstances. [A special relationship may include close relatives, regardless of age, who live in the same household or who visit frequently.]" (CALJIC No. 9.40.4 (2020 ed.) pp. 971-972.)

22

in joint possession of property, multiple robbery convictions are proper. (*Scott*, *supra*, 45 Cal.4th at pp. 749-750; *Ramos*, *supra*, 30 Cal.3d at p. 589.)

In summary, viewing the record in the light most favorable to the prosecution, we conclude that the evidence supports Rico's robbery convictions as to M.N. and John Doe.

C. *The Use of a Juvenile Adjudication as a Prior Strike Did Not Violate Smith's Sixth Amendment Right to a Jury Trial*

1. Additional Background

The prosecution charged Smith with two prior strike convictions consisting of a 2014 burglary conviction and a 2008 juvenile adjudication for robbery. Smith admitted the truth of these two prior convictions. The court struck the 2014 conviction, but refused to strike the 2008 juvenile adjudication. Thereafter, the court doubled the sentence imposed for each of the substantive counts based on Smith's prior juvenile adjudication.

2. Analysis

In *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) the United States Supreme Court stated that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id.* at p. 490.) Citing *Mathis v. United States* (2016) 579 U.S. ___ [136 S.Ct. 2243] (*Mathis*), *Descamps v. United States* (2013) 570 U.S 254 (*Descamps*), and *People v. Gallardo* (2017) 4 Cal.5th 120 (*Gallardo*), Smith asserts that the trial court violated his Sixth Amendment right to a jury trial by using a juvenile adjudication to enhance his sentence. Based on these cases, he contends that *People v. Nguyen* (2009) 46 Cal.4th 1007 (*Nguyen*), which previously found that the Sixth Amendment permitted juvenile adjudications to serve as strikes under California law, is no longer constitutionally viable. Acknowledging that defense counsel did not raise

this issue in the trial court, Smith contends that he received ineffective assistance of counsel. The People argue that Smith forfeited this argument by failing to raise it in the trial court and, even if preserved, that *Nguyen* remains good law. To avoid Smith's ineffective assistance contention, we exercise our discretion to address the issue on its merits. (*In re Sheena K.* (2007) 40 Cal.4th 875, 887, fn. 7 ["an appellate court may review a forfeited claim—and '[w]hether or not it should do so is entrusted to its discretion' "].)

The California Legislature has decided that the Three Strikes law applies to a defendant who has suffered a qualifying prior juvenile adjudication. (§ 667, subd. (d)(3).) In *Nguyen*, *supra*, 46 Cal.4th 1007, our Supreme Court held that this law does not violate a defendant's Sixth Amendment jury rights or the *Apprendi* rule. In 2016, after *Mathis* and *Descamps* were decided, the California Supreme Court addressed *Nguyen*, rejecting defendant's argument that his juvenile adjudications were inadmissible as prior convictions under *Apprendi* and refusing to reconsider *Nguyen*. (*People v. Landry* (2016) 2 Cal.5th 52, 117, fn. 18.)

In *Gallardo*, *supra*, 4 Cal.5th 120, the defendant waived her right to a jury trial over an allegation that she had a prior assault conviction but disputed the allegation that the assault constituted a serious felony and qualified as a prior strike. (*Id.* at pp. 125-126.) The defendant had entered a plea in her prior assault case. (*Id.* at p. 125.) The trial court reviewed a preliminary hearing transcript and determined that the assault qualified as a prior strike. (*Id.* at p. 126.) Citing *Descamps*, the California Supreme Court found the trial court's method untenable because the court essentially "engaged in a form of factfinding that strayed beyond the bounds of the Sixth Amendment." (*Gallardo*, at p. 136.) The *Gallardo* court explained that in determining whether a prior conviction qualifies as a strike, the trial court

24

may consider only a limited class of documents that "might help identify what facts a jury necessarily found in the prior proceeding." (*Id.* at p. 137.) A preliminary hearing transcript is not within that class because "[a] sentencing court reviewing that preliminary transcript has no way of knowing whether a jury would have credited the victim's testimony had the case gone to trial." (*Ibid.*)

The Second District Court of Appeal recently addressed this issue, stating "[A]lthough *Gallardo*, [*supra*, 4 Cal.5th 120], *Mathis*, [*supra*, 579 U.S. ___] and *Descamps*[, *supra*, 570 U.S. 254] all disapprove judicial factfinding by a sentencing court to determine whether the defendant suffered a qualifying prior conviction when that issue is unclear from the fact of the conviction itself, none of those cases calls into question *Nguyen's* holding that a sentencing court may impose a sentence enhancement based on a prior juvenile adjudication, despite the lack of right to a jury trial in that proceeding. As *Nguyen* remains good law, we are bound to follow it and to reject defendant's argument that the use of his prior juvenile adjudication as a prior strike violated his constitutional rights." (*People v. Romero* (2019) 44 Cal.App.5th 381, 389-390.) We agree with this analysis. Accordingly, we reject Smith's contention that the trial court erred by using his juvenile adjudication to enhance his sentence.

D. *Remand to Consider Striking the Five-Year Enhancement for Smith's Prior Serious Felony Conviction*

1. Additional Background

After the jury rendered its guilty verdicts, Smith admitted that he had two prior strikes, one prior serious felony, and that he was on felony probation when he committed the crimes. The court dismissed one of Smith's prior strikes under *Romero*, *supra*, 13 Cal.4th 497 citing Smith's developmental disability, but declined to dismiss his juvenile strike prior

25

because it involved direct threats of violence and was similar to the instant crimes. The trial court sentenced Smith to an aggregate prison term of 85 years and four months plus 50 years to life, which included a five-year term for the prior serious felony on the indeterminate sentence in count 12 (sexual penetration) and a five-year term on the determinate sentence.

2. Analysis

Under the previous version of section 1385, subdivision (b), a court was required to impose a five-year consecutive term for "any person convicted of a serious felony who previously has been convicted of a serious felony" under section 667, subdivision (a), and the court had no discretion "to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667." (Former §§ 1385, subd. (b); 667, subd. (a).) Effective January 1, 2019, Senate Bill No. 1393 amended section 1385, subdivision (b), to allow a trial court to exercise its discretion to strike or dismiss a section 667 prior serious felony conviction for sentencing purposes. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971 (*Garcia*).) In *Garcia*, the court held that Senate Bill No. 1393 applies to all judgments not final as of the bill's effective date of January 1, 2019. (*Garcia*, at p. 973.)

Smith asserts that his case should be remanded for resentencing in light of Senate Bill No. 1393. The Attorney General concedes that Senate Bill No. 1393 applies retroactively to Smith's nonfinal case, but argues that remand would be futile based on the trial court's statements at sentencing.

The court sentenced Smith approximately four months *before* the amendment to section 1385. When a court is unaware of the scope of its discretionary powers, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached

26

the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

The trial court exercised its discretion to strike one of Smith's prior strikes, but declined to strike the second juvenile strike and sentenced Smith under the one strike law. Additionally, as the Attorney General notes, the trial court made comments during Smith's sentencing hearing acknowledging Smith's purposeful and cruel conduct toward his victims. Nonetheless, we cannot say, on the record before us, that the trial court clearly indicated it would decline to exercise its discretion to strike Smith's prior serious felony enhancement if presented with the opportunity to do so.

Accordingly, we vacate Smith's sentence and remand to allow the trial court to decide whether to exercise its discretion to strike the five-year enhancement imposed under section 667, subdivision (a). If the court does so, it is to resentence Smith. If the court declines to strike this enhancement, Smith's previously imposed sentence shall remain in effect. We express no opinion as to how the trial court should exercise its discretion on remand.

E. *Rico Forfeited his Ability to Pay Argument*

The trial court imposed victim restitution of $59,484, and $10,000 restitution fines (§§ 1202.4, 1202.45), a $1,080 court security fee (§ 1465.8), a $810 criminal conviction assessment (Gov. Code, § 70373), a $154 fee (Gov. Code, § 29550.1), a $300 sex registration fee (§ 290.3), and a $39 theft fine (§ 1202.5). Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Rico argues that the trial court erred by imposing a court operations assessment as required by section 1465.8 and the court facilities assessment mandated by Government Code section 70373, without first determining his ability to pay. (*Dueñas*, at p. 1168.) He further contends that the trial court must stay execution of the restitution fine under section 1202.4 unless and

27

until the court determines that he has the has the ability to pay the fine. (*Dueñas*, at p. 1172.)

The Attorney General asserts that Rico forfeited his argument regarding the restitution fine by failing to object in the trial court. The Attorney General also argues that *Dueñas* was wrongly decided as to punitive fines, but "does not take issue with the *Dueñas* opinion insofar as it holds the imposition of non-punitive assessments violates due process where a defendant demonstrates an inability to pay them."

The validity of *Dueñas*, *supra*, 30 Cal.App.5th 1157 is unsettled and will be decided by our Supreme Court. (*People v. Hicks* (2019) 40 Cal.App.5th 320, 326, review granted Nov. 26, 2019, S258946; *People v. Kopp* (2019) 38 Cal.App.5th 47, 94, review granted Nov. 13, 2019, S257844.) Accordingly, it is unnecessary for us to comment on the merits of the analysis employed in *Dueñas*.

Even before *Dueñas*, Rico had a statutory right to object to the $10,000 maximum restitution fine on the basis that he lacked the ability to pay. (§ 1202.4, subd. (c); *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 (*Gutierrez*).) His failure to do so forfeits this claim of error on appeal. (*Gutierrez*, at p. 1033 ["[E]ven if *Dueñas* was unforeseeable (a point on which we offer no opinion), under the facts of this case [defendant] forfeited any ability-to-pay argument regarding the restitution fine [above the statutory minimum] by failing to object."].) Because Rico did not raise any issue concerning his ability to pay a $10,000 restitution fine, we conclude he has also forfeited his challenge to the much smaller fees and assessments. (*Gutierrez*, at p. 1033 [defendant's failure to challenge a restitution fine greater than minimum on grounds of inability to pay forfeited defendant's

objection to fees on same grounds]; accord, *People v. Smith* (2020) 46 Cal.App.5th 375, 395.)[8]

## DISPOSITION

Smith's sentence is vacated and the matter is remanded to allow the trial court to exercise its discretion and determine whether to strike the serious felony enhancement. If the court strikes the enhancement, then the court shall resentence Smith accordingly and shall forward an amended abstract of judgment to the appropriate authorities. If the court declines to strike this enhancement, Smith's previously imposed sentence shall remain in effect. In all other respects, the judgments are affirmed.

IRION, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.

---

[8] Rico did not challenge the court's award of victim restitution in his opening brief, but mentions it his reply brief. By not raising this argument in his opening brief, however, Rico forfeited this argument. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1218-1219.)