Filed 2/15/18

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| THE PEOPLE, | B279767 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA093456) |
| v. | |
| LOUIS JAMES HUTCHINSON, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Mark S. Arnold, Judge. Affirmed in part and reversed in part.

Sunnie L. Daniels, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Shawn McGahey Webb,

Supervising Deputy Attorney General, and Nima Razfar, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury convicted Louis James Hutchinson (Hutchinson) of five counts of first degree residential robbery and five counts of home invasion robbery. Hutchinson contends that a 15-year-old girl inside the residence at the time of the robbery—the homeowners' daughter—could not be deemed a victim of the robbery because she did not actually or constructively possess any of the stolen property. We disagree. Hutchinson also contends that his convictions on counts 1 through 5 must be vacated. We agree. In all other respects, the judgment is affirmed.

## BACKGROUND

### I.    Overview of Charges

Hutchinson and codefendants Kwan Smith (Smith) and Deavon Phillips (Phillips) were charged with five counts of first degree residential robbery (Pen. Code,[1] § 211; counts 1–5) and five counts of home invasion robbery (§ 211; counts 6–10).[2]    As to counts 6 through 10, the information alleged

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Each count named a different victim. Daren Gaynair was the named victim in counts 1 and 6. Daren's wife, Charlotte Jackson. was the named victim in counts 2 and 7. Daren and Charlotte's daughter, Daijanon, was the named victim in counts 3 and 8. (Her name is spelled "Daijavon" in the trial transcripts.) Daren and Charlotte's daughter,

2

that Hutchinson, Smith and Phillips acted in concert and entered an inhabited dwelling house during the commission of the robbery. (§ 213, subd. (a)(1)(A).)

The information also alleged as to all counts that Hutchinson and Phillips personally used a Taser, (§ 12022, subd. (b)(1)), as well as a firearm (§ 12022.53, subd. (b)), and that a principal had been armed with a firearm (§ 12022, subd. (a)(1)). The information also alleged that Hutchinson suffered a prior strike conviction (§§ 667, subds. (b)-(i); 1170.12, subds. (a)-(d)), a prior serious felony conviction (§ 667, subd. (a)(1)), and had served two prior prison terms (§ 667.5, subd. (b)).

Before trial, Smith and Phillips pleaded no contest to the charged offenses and admitted the special allegations. Hutchinson proceeded to jury trial. The jury convicted Hutchinson on all counts and found true the allegation that a principal had been armed with a firearm. As to the allegation that Hutchinson had personally used a firearm during the offenses (§ 12022.53, subd. (b)), the jury found it to be not true as to counts 4, 5, 9, and 10, and deadlocked on the other counts.[3] The court declared a mistrial on the deadlocked allegations and granted the prosecution's

Dexenia, was the named victim in counts 4 and 9. Daren's mother, Shirley Sabido, was the named victim in counts 5 and 10.

[3] Following the prosecution's case in chief, the trial court dismissed the allegation that Hutchinson had used a Taser (§ 12022, subd. (b)(1)).

3

subsequent request to dismiss them.  Hutchinson admitted the prior conviction allegations.

The trial court sentenced Hutchinson to a total of 42 years, four months in state prison.  The court used count 6 as the base term, imposed the upper term of nine years, doubled to 18 years for Hutchinson's prior strike conviction, plus a one-year term for the firearm enhancement (§ 12022, subd. (a)(1)).  As to each of counts 7 through 10, the trial court imposed a consecutive term of two years (one-third the middle term of six years), doubled to four years for the prior strike, plus four months for the firearm enhancement.  The trial court imposed additional terms of five years for the prior serious felony and one year for the prior prison term.  The trial court stayed the remaining counts and enhancements.

## II.    Prosecution Evidence

Daren Gaynair and his wife, Charlotte Jackson, lived in Rancho Palos Verdes with their children—daughters Daijavon (age 19), Dexenia (age 15), Dakota (age 3), and sons Drake and Dillon.  Daren's mother, Shirley Sabido, and sister, Kim Gaynair, also lived at the residence.   Daren owned a tax preparation and accounting business, where Daijavon also worked.

On December 11, 2015, at approximately 8:30 a.m., Daijavon dropped off her brothers at school and returned home.  As Daijavon was about to leave again to drive her sister Dakota to school and then go to work, she did not lock the front door after entering the house.  Daijavon went to the

4

kitchen area with her parents and helped Daren put on his socks since he had a broken arm in a sling. Hutchinson, Smith, Phillips, and another man, then suddenly appeared inside the house. The Gaynairs did not know any of the men.

Hutchinson pointed a gun at the family and ordered them to "get the fuck down." Daren and Charlotte complied. Daijavon asked Hutchinson if he was joking. Hutchinson moved closer toward Daijavon and said, "Bitch, I said get down." Daijavon asked, "Are you serious?" Hutchinson then ordered one of the other men to "tase that bitch." The man proceeded to tase Daijavon a total of 15 times, including on her legs, back, stomach, and side. Daren implored Daijavon to get down on the ground, which she finally did. Hutchinson tied Daren's wrists behind his back with a cloth. When Daijavon told the armed man that Daren's arm was broken, the man replied, "I don't care. If I don't do this they are going to kill me." The man with the taser tied Daijavon's wrists with plastic zip ties. A third man tied Charlotte's wrists with zip ties. Daijavon broke apart the ties. The man with the taser grabbed Daijavon by the head and smashed her head on the ground several times. The man told Daijavon not to move, retied her wrists, and tased her again.

Hutchinson made a phone call and told the person, "We're in. We got 'em." Hutchinson told the Gaynairs that he was there to get the money, stating, "This is an inside job. You see, I don't have on a mask." Hutchinson asked where

5

the other family members were.  Daren said they were downstairs.  Hutchinson and two of the other men then went downstairs.  One man remained with the Gaynairs in the kitchen.

When the men confronted the Gaynairs upstairs, Dexenia was downstairs in her bedroom with Dakota. Dexenia heard the commotion and initially believed Daijavon was getting into trouble with her parents.  Daren's sister Kim was in a nearby bathroom and heard someone from upstairs falling on the floor.  She exited the bathroom and saw Dexenia crying.  Kim then went into her mother Shirley's room to check on her and again heard someone from upstairs falling on the floor.  She went to Dexenia who continued to cry.  She told Dexenia to go to her room with Dakota and lock the door.

A minute or so later, Hutchinson and one of his accomplices entered Dexenia's bedroom.  Hutchinson pointed a gun at Dexenia and ordered her to get down.  Dexenia was immediately tased from behind and fell to the floor. Dexenia pleaded with Hutchinson not to hurt Dakota. Hutchinson told Dexenia that her father had done " 'something bad.' "  When Kim heard Hutchinson's voice, she told her mother Shirley that she would go get help.  Kim exited the house and made her way to a neighbor's home.

Moments later, Phillips entered Shirley's room with one of the other men, who then gave Phillips a gun and left. Phillips saw an open door in her room and asked Shirley if anyone had gone outside.  Shirley lied and said the door was

usually left open to let in some air.  Phillips threatened to shoot Shirley but she begged him not to and defecated on herself out of fear.  Phillips ordered Shirley to get in her wheelchair.  Shirley told him she could not move herself.  Phillips noticed that Shirley was looking at him closely.  He held a pillow over her face and nearly suffocated her.

During this time, Hutchinson took Dexenia upstairs and placed her on the ground with her parents and Daijavon.  Her wrists were tied behind her back with a cloth.  Dakota was also brought upstairs.  She stood near her family.  At some point, Hutchinson told Daren that he was going to kill him.  Daren pleaded with him to spare his daughters.  Hutchinson asked Daren where the safe was located.  Daren said it was in the hallway closet.   Hutchinson then said, " 'I already know where the safe is.  I just wanted to see if you were gonna lie.' "

Hutchinson and the man with the taser pulled Daren up from the ground and walked with him to the closet where the safe was located.   Once there, Daren was tased four times and dropped to the ground.   Hutchinson went inside the closet as the other man held a gun to Daren's head.  Hutchinson asked for the combination, which Daren provided.  Hutchinson eventually managed to open the safe but saw no money inside.  Hutchinson asked Daren, " 'Where's the fuckin' money?' "  Daren said he did not have any.  The men then kicked Daren.  Hutchinson said, " 'Stop fuckin' with me.  I know you got money.' "  Daren told Hutchinson that there were two cashier's checks inside

envelopes in the safe. Hutchinson took the checks but told Daren that if he did not get his cash, he would take Dakota with him. Daijavon overheard Hutchinson's threat and said she had $3,500 in her purse. The man with the taser grabbed her purse and took out the cash. Hutchinson also took cell phones belonging to Daijavon, Daren, Charlotte, and Shirley. Dexenia did not have a cell phone.

By this time, Kim had made her way across the street to a neighbor's house where she called 911. The call was made at 9:03 a.m. Deputies arrived at the Gaynair's residence within minutes. When he heard the sirens, Hutchinson yelled, "TC, 1, 2, 3. Let's go," and fled the house with his accomplices. Hutchinson and Smith ran into a nearby ravine about a quarter of a mile away. Deputies found and detained the two shortly thereafter. After searching Smith, deputies found a loaded, 38-caliber revolver and zip ties. Deputies recovered jewelry, including cuff links, watches, necklaces, and a bracelet, as well as two $50,000 cashier's checks from Hutchinson. Phillips was located nearby as he ran along Hawthorne Boulevard. During a field show-up, Shirley identified Phillips as one of the perpetrators. Deputies found zip ties in Phillips' pocket when they booked him into custody.

During the investigation, deputies discovered muddy footprints from the side of the Gaynair residence to a backyard fence that led into a strip of land separating the property from Hawthorne Boulevard. A taser made to look like a cell phone was found near the fence. A parked Nissan

Maxima with the doors unlocked and key in the ignition was located across the street from the Gaynair residence. Inside the vehicle, deputies found Phillips' California identification card, a package of zip ties, and a receipt from Home Depot for the zip ties. Deputies also found jewelry on the side of the house. Daijavon's purse was found in a trash bag in the hallway. The money was not inside. The master bedroom was ransacked, with drawers opened and clothes thrown on the floor. Deputies never found the cell phones, watches, and additional jewelry taken during the robbery.

## III. Defense Evidence

Los Angeles Sheriff's Department Deputy Jamila Leal testified that Daren told her that he would not be able to identify any of the perpetrators since he was not wearing his glasses and had his eyes closed for most of the time during the incident. Dennis Robateau worked as Shirley's caregiver and Daren's handyman at one of Daren's businesses. Robateau told deputies he saw Phillips speaking with an employee at Daren's tax business a couple of months before the robbery. Although a detective spoke with the employee, he determined there was no basis for further investigation. The Gaynairs also said that they had no reason to suspect anyone wanted to retaliate against them.

## DISCUSSION

## I. Sufficiency of the Evidence

Hutchinson contends that the evidence was insufficient to support his conviction for robbing Dexenia (counts 4 and

9

9) because Dexenia was in neither actual nor constructive possession of any property that was taken at the Gaynair residence.   We disagree.

### A.   STANDARD OF REVIEW

On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence " 'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.)  "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  "In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Ibid.*)  " '[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt.' " (*Nguyen*, at pp. 1055–1056.)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Zamudio*, at p. 357.)  "In our limited role on appeal, '[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility

10

of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 161–162.)

### B.    ROBBERY AND CONSTRUCTIVE POSSESSION

Applying the substantial evidence standard, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  (*People v. Marshall* (1997) 15 Cal.4th 1, 34.)  Robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.)  "Robbery is larceny with the aggravating circumstances that 'the property is taken from the person or presence of another . . . ' and 'is accomplished by the use of force or by putting the victim in fear of injury.' " (*People v. Anderson* (2011) 51 Cal.4th 989, 994.)  Any person who owns, or who exercises direct physical control over, or who has constructive possession of, any property taken may be a victim of a robbery if force or fear is applied to such person.  (*People v. Scott* (2009) 45 Cal.4th 743, 749–750 (*Scott*).)  Furthermore. "[t]wo or more persons may be in joint constructive possession of a single item of personal property, and multiple convictions of robbery are proper if force or fear is applied to multiple victims in joint possession of the property taken." (*Id.* at p. 750.)

11

Constructive possession requires only "that there be some type of 'special relationship' with the owner of the property sufficient to demonstrate the victim had authority or responsibility to protect the stolen property on behalf of the owner." (*Scott*, *supra*, 45 Cal.4th at p. 753.) The victim need not have "general authority to control the owner's property in other circumstances." (*Id*. at pp. 753–754.) A special relationship may include close relatives who live in the same household or visit frequently. (*People v. Weddles* (2010) 184 Cal.App.4th 1365, 1369–1370 (*Weddles*).) When analyzing constructive possession authorities, *Scott* relied on *People v. Gordon* (1982) 136 Cal.App.3d 519, which found that the defendant committed robbery when he pointed a gun at the parents of an adult son who lived in the parents' residence and then proceeded to the son's bedroom to steal property. (*Gordon*, at pp. 523–524.) *Gordon* affirmed the defendant's robbery convictions as against both parents, noting that the victims were responsible for preserving the property taken and finding constructive possession by the parents of their adult son's personal items. (*Id*. at p. 529; see *People v. DeFrance* (2008) 167 Cal.App.4th 486 (*DeFrance*) [mother robbed of car owned by her adult son]; *Weddles*, at p. 1365 [man robbed of his brother's money].)

Here, substantial evidence supports the determination that Dexenia constructively possessed the stolen property under the special relationship doctrine. She lived at the residence, was present inside the home during the entire robbery, and, as with the other victims, was physically

assaulted and restrained in order to prevent her from interfering with the crime's commission. Furthermore. Dexenia's familial relationship with the stolen property's owners (her parents and siblings) expressly falls within the special relationships set forth in Civil Code section 50.[4] (See *Scott*, *supra*, 45 Cal.4th at pp. 753–754, 757–758.) Thus, the robbery conviction in this case may be affirmed based on constructive possession of an immediate family member's property. (See *Weddles*, *supra*, 184 Cal.App.4th at p. 1370.)

Hutchinson cites *People v. Ugalino* (2009) 174 Cal.App.4th 1060 (*Ugalino*), in support of his argument that Dexenia could not constructively possess the stolen property. In *Ugalino*, Joshua Johnson and Jessie Rider shared a two-bedroom apartment with several other people. (*Id.* at p. 1062.) The defendant and his accomplice entered the apartment on the pretense of buying marijuana from Johnson, a drug dealer. Once inside, the defendant and his accomplice drew guns on Johnson, and the defendant announced, "[Y]ou're getting jacked." (*Id.* at pp. 1062–1063.) Johnson stuffed the drugs that he had been holding into his

---

[4] Civil Code section 50 provides: "Any necessary force may be used to protect from wrongful injury the . . . property . . . of a spouse, child, parent, or other relative, or member of one's family, or of a ward, servant, master, or guest." Under this statute, Dexenia had the authority to protect the stolen property, and thus had constructive possession of it. Her parents' presence does not change the analysis. (See *Scott*, *supra*, 45 Cal.4th at p. 750.)

pants and fled the apartment.  The assailants followed Johnson in pursuit.  (*Id.* at p. 1063.)  On appeal, the Third District reversed the defendant's conviction for attempted robbery of Rider.  (*Id.* at p. 1065.)

In reversing the conviction, the Third District noted that "Rider did not have actual possession of the marijuana, and Johnson stored the marijuana in a locked safe in his bedroom."  (*Ugalino, supra*, 174 Cal.App.4th at p. 1065.)  Rider did not have access to the safe.  "In fact, Rider did not even have a key to the apartment, most of the time coming and going only when someone else was home."  (*Ibid.*)  Moreover, "there was no evidence [Johnson] expected Rider to assist him" in protecting his belongings.  (*Ibid.*)  Lacking any connection to Johnson other than sharing an apartment for only three to four months, the Third District held that Rider could not be deemed to have constructive possession of the personal property locked away by Johnson.  (*Ibid.*)

In *Ugalino, supra,* 174 Cal.App.4th 1060, there was no "special relationship" between the owner of the stolen property and a roommate who did not even have his own key to the apartment.  (*Id.* at p. 1065.)  Here, it is undisputed Dexenia resided in, and had unrestricted access to, the home and that nearly all the stolen property, except perhaps the cashier's checks stored in the safe, was accessible to the home's residents.  Thus, *Ugalino* is easily distinguishable.

Hutchinson points to Dexenia's status as a 15-year-old minor at the time of the robbery to argue that Dexenia could not have had constructive possession of any of the stolen

14

property.  As noted by Hutchinson, however, no published case in California has addressed whether a minor had sufficient possession of his or her parents' property, while the parents were present, to render the minor a robbery victim.  First, we observe that the jury may have reasonably found that some of the property taken belonged to Dexenia personally given that her mother testified that watches belonging to her daughters were stolen.  Second, "[c]onstructive possession does not require an absolute right of possession." (*DeFrance, supra*, 167 Cal.App.4th at p. 497.) It is for this reason that constructive possession will be found when the person has a special relationship with the owner of the property.  (See *ibid*.)

We also note that "[b]y requiring that the victim of a robbery have possession of the property taken, the Legislature . . . excluded as victims those bystanders who have no greater interest in the property than any other member of the general population." (*Scott, supra*, 45 Cal.4th at pp. 757–758.)  Dexenia plainly does not fall under that category.  Although Hutchinson cites *Brooks v. The People* (1872) 49 N.Y. 436, to argue that a minor must be left in "sole charge" of his or her parents' residence when a robbery occurs in order to be deemed a victim of that robbery, California courts have expressly refused to make such a distinction when a business is robbed and the victim is a store employee with no security function or cash-handling responsibilities, such as a janitor.  (See *People v. Gilbeaux* (2003) 111 Cal.App.4th 515, 522–523.)  Given that one need

15

not own or have a legal right to the property in order to have possession of it, (see *People v. Galoia* (1994) 31 Cal.App.4th 595, 597), as well as the codified special relationship between Dexenia and her parents, we decline to hold that Dexenia could not be deemed a robbery victim. Unarguably, in effecting the theft of property, the defendants subjected Dexenia to the same force and intimidation as her other family members. We see no rational basis to conclude that a minor's constructive possession of or possessory interest in her family's property is non-existent if majority members of her family are present. This is not 1872. The forcible taking of family-owned (parents or siblings) property impacts both children and adults within a family unit.

## II.    Counts 1 Through 5 Must Be Reversed

Counts 1 through 5 of the information charged Hutchinson, Smith and Phillips with first degree residential robbery, in violation of section 211. Counts 6 through 10 of the information charged Hutchinson, Smith and Phillips with home invasion robbery, in violation of section 211. As to counts 6 through 10, the information further alleged that Hutchinson, Smith and Phillips acted in concert and entered an inhabited dwelling house during the commission of the robbery, in violation of section 213, subdivision (a)(1)(A).

On appeal, Hutchinson argues that counts 1 through 5 must be vacated because the "in-concert" allegations appended to counts 6 through 10 are sentencing enhancements, not separate offenses. In other words,

16

Hutchinson suffered ten convictions for five substantive offenses.   The People agree.

We also agree.  Multiple convictions may not be based on necessarily included offenses based on one criminal act. (See, e.g., *People v. Moran* (1970) 1 Cal.3d 755, 763 ["If the evidence supports the verdict as to a greater offense, the conviction of that offense is controlling, and the conviction of the lesser offense must be reversed"].)  An offense is necessarily included within another if the statutory elements of the greater offense include all the elements of the lesser offense.  (*People v. Reed* (2006) 38 Cal.4th 1224, 1227.)  As noted above, robbery is the "felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  (§ 211.)  First degree residential robbery is robbery perpetrated in an "inhabited dwelling house."  (§ 212.5.)  Home invasion robbery is first degree residential robbery committed "in concert" with one or more other people.  (§ 213, subd. (a)(1)(A).)  An allegation that robbery was committed in concert within the meaning of section 213, subdivision (a)(1)(A), is an additional element of the crime of first degree robbery; it does not create a separate offense.  (See *In re Jonathan T.* (2008) 166 Cal.App.4th 474, 482.)  Therefore, counts 1 through 5 are necessarily included in counts 6 through 10.  As a result, Hutchinson's convictions on counts 1 through 5 must be reversed.

## DISPOSITION

The judgment is reversed as to counts 1 through 5. In all other respects, the judgment is affirmed.

CERTIFIED FOR PUBLICATION.

JOHNSON, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.