Filed 11/18/22  P. v. Hernandez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE HERNANDEZ,<br><br>    Defendant and Appellant. | F082679<br><br>(Merced Super. Ct. No. 15CR-00084B)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Jeanne Schechter, Judge.

Robert J. Beles and Micah Reyner for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

On the night of August 1, 2014, defendant, William White, Victor Hernandez, and Orlando Yepez entered a house and robbed Juan A.[1] and Gloria of drug money.  On

---

[1] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials.

February 7, 2019, a jury convicted defendant of two counts of first degree robbery (Pen. Code, § 211, count 1 (Juan); count 3 (Gloria))[2] and as to both counts found true the allegation the robbery was committed in concert with two or more other perpetrators inside an inhabited dwelling; and first degree burglary (§ 459, subd. (a), count 4) with the allegation a person other than of the perpetrators was present in the dwelling house at the time the burglary was committed. Defendant waived jury trial as to the bifurcated enhancements and as to each count admitted two strike priors (§§ 667, subds. (b)−(i), 1170.12, subds. (a)−(d)), two five-year enhancements (§ 667, subd. (a)(1)), and two prison priors (§ 667.5, subd. (b)). As to counts 1 and 3, the trial court sentenced defendant to consecutive upper terms of nine years, tripled to a total of 27 years to life pursuant to section 667, subdivision (e)(2)(A), plus two additional five-year enhancements pursuant to section 667, subdivision (a), for a total term of 64 years to life. As to count 4, the trial court sentenced defendant to 25 years to life but stayed the sentence pursuant to section 654.[3]

On appeal, defendant contends there is insufficient evidence to support his conviction for robbery against Gloria because she did not "constructively possess" the drug money. Defendant further contends he received ineffective assistance of counsel when his trial counsel failed to object to the prosecutor's prejudicial, misleading statements during his closing argument.

We conclude there exists substantial evidence to support defendant's conviction for robbery against Gloria because Gloria constructively possessed the drug money, and therefore we affirm his conviction as to count 3. Further, we conclude, that even if defendant received ineffective assistance of counsel, he was not prejudiced.

Accordingly, we affirm the judgment.

---

[2] All further references are to the Penal Code, unless otherwise stated.
[3] As to each count, the prosecutor dismissed defendant's two prison prior enhancements (§ 667.5, subd. (b)).

2.

# FACTS

## I. Events Leading Up to the Offense

On the night of July 31, 2014, William White and Tiffany R. drove in a white Mercedes Benz to Modesto. After arriving in Modesto, William spoke with his friend, defendant, while Tiffany remained in the car. A month before, William had told Tiffany defendant owed him some money. William and defendant then got into the car and drove to a liquor store. Subsequently, they drove to a location nearby and defendant's younger brother[4] got in the back seat with defendant. The group drove through a rural area and eventually stopped next to a black BMW car with dark tinted windows. Defendant exited the car and got into the BMW and came back with a black backpack. The car and the BMW were driven together and stopped in a residential area with "[r]eally big houses." Defendant and William exited the car and walked around the corner, while defendant's little brother eventually moved from the back seat into the driver's seat. Before William left, he told Tiffany, " 'I'll be back in a few minutes. I love you.' "

## II. The Offense

In July of 2014, Juan A. lived alone in a house in Hilmar, but his girlfriend Gloria, who he had been dating for two or three years, stayed with him. Juan testified under a "use immunity" agreement that on the night of July 31, 2014, he just got back from Sacramento with either $10,000 or $12,000 in drug money and placed the money on the kitchen counter.[5] A half-hour to one hour later, Gloria watched television while Juan made a sandwich when Victor Hernandez and Orlando Yepez[6] arrived unannounced at the house and knocked on the door. Juan testified that they both were wearing black.

---

[4] Although defendant's little brother was never identified by name, it appears the litigants may have been referring to "Hugo Hernandez."

[5] Juan admitted he had a lengthy criminal history. Juan was in custody and awaiting extradition to New Jersey to be sentenced on drug-related charges and had pending criminal charges in Stanislaus County at the time of his testimony.

[6] Orlando was also referenced throughout the trial as his nickname "Joe" or "Fat Joe." For purposes of this appeal, we will refer to him as Orlando.

Juan knew both Victor and Orlando from prior illegal activities. Gloria answered the door and both Victor and Orlando came inside. Juan testified that Orlando observed "how much [money he] would bring home" from selling drugs and he knew Juan was in the drug business. Orlando told Juan he had just been robbed and he tried to convince Juan to go to a hotel to confront the robbers. Orlando also asked Juan whether he had any weapons on him.

At this point, Orlando punched Juan while he was standing near the kitchen counter. Orlando and Juan started fighting and Victor then ran towards Juan with a black handgun. During the struggle, William and defendant ran into the house. Defendant jumped up onto the kitchen counter, while William rushed Gloria with a gun and grabbed her and threw her to the ground. Defendant then stabbed Juan with a screwdriver in the hand and in the back. Juan testified that he suffered stab wounds, scrapes, puncture wounds, and bruising.[7] While they were fighting, Juan heard Victor say, " '[G]et out the way. I'm going to shoot him.' " Juan and Victor then struggled over the gun causing the gun to fire "[a] couple times" towards the kitchen area. Orlando ended up being shot. Juan never saw anyone go into the bedroom.

At or around this time, Tiffany heard "some, like, snap, crack, popping noises from a distance," which she believed were "[e]ither gunshots or fireworks." Defendant's little brother attempted to make a phone call in the car, but nobody answered.

## III. Events After the Offense

Juan then grabbed the handgun and ran towards the garage and exited the house. He then attempted to bang on his neighbor's doors, but nobody answered. At this point, Juan called 911 and ended up on the side of his neighbor's house. Juan observed Victor looking for defendant, but he ended up getting into a BMW car and leaving the scene.

---

[7] Detective Sanchez later testified that he did not observe an injury on Juan's back he would characterize as a "stab wound."

Subsequently, William sprinted back to the car with a wad of money in his hand and defendant was not with him. William screamed, " '[M]ove, move, move.' " Defendant's younger brother exited the driver's seat, went into the back seat and William entered the driver's seat and drove fast with the headlights turned off. Defendant's younger brother asked William where his brothers were and William responded they were fine, but " 'Gordo' " or " 'Fats' " was most likely not going to make it. Further, William frantically stated, " 'The house lick went bad.' "[8] William ended up dropping off defendant's younger brother at defendant's house and then drove to a gas station. At the gas station, William told Tiffany to remove a piece of paper that covered the entire rear license plate, which she did. Eventually they drove to Concord where Tiffany lived. The next day, William gave Tiffany $400 or $500 in cash for bills.

## IV.    Subsequent Law Enforcement Investigation

Deputy V. LaMattina was dispatched to the Hilmar house and immediately noticed two individuals coming out the house, later identified as Juan and Gloria. Juan appeared very distressed and emotional and bled from his left arm or hand. Deputy LaMattina noticed a "wad or bundle of cash in the middle of the [house's] lawn." He then swept the house and observed Orlando dead in the kitchen laying on top of a rifle.[9] Further, he noticed "glass shatters all over the living room, spent handgun shells in the living room area … [and] pools of blood, some of them led … down the hallway towards the garage" door. He then went back outside and noticed the cash on the lawn was missing. Gloria admitted she picked up the cash and placed it in her pocket, and Deputy LaMattina told her to place it back on the lawn in the general area where it was originally found.

---

[8] Tiffany testified she understood the word " 'lick' " as "street slang for robbery."

[9] A subsequent autopsy established Orlando suffered two gunshot wounds: a nonfatal graze wound on his upper left arm and a fatal wound to his left lung, heart, and liver. Powder burns or gunshot residue around the wound were not found, which would have been indicative of a close-range shot.

Detective K. Ly testified he took multiple photographs of the scene. During this time, Detective Ly located a footprint on the concrete towards the garage door, which indicated to him the individual who made the footprint wore socks. He also located a rifle underneath Orlando and a .45-caliber handgun near the couch. The handgun had been fired until empty. There were "puffs on the back of [the] couch," which was consistent with a bullet going through the couch. Detective Ly also located nine-millimeter casings indicating two firearms were used.

During the search, officers also located two screwdrivers, one with a shaved tip. Juan identified the nonshaved tip screwdriver as the one possessed by defendant when he entered the home and stabbed him. Both screwdrivers were later tested by the Department of Justice for blood, fibers, fingerprints, and DNA, but no evidence was found. A forensic DNA analyst testified that if someone stabbed another with a screwdriver causing that person to bleed it is "[v]ery likely" DNA evidence would be located on that screwdriver, assuming it was not subsequently cleaned with either bleach or running water.

Detective S. Sanchez then interviewed Juan. Detective Sanchez testified that during the interview it was possible Juan called Orlando a " '[g]reedy mother f[**]king piece of shit.' " Additionally, Juan told Detective Sanchez the money found on the front lawn belonged to Gloria, and he attempted to dissociate himself from the money.[10]

Officers then obtained cell phone records associated with defendant and his brothers. Specifically, the records established defendant's little brother was in the area of Hilmar, within several miles of the crime scene on the night of the incident. During the time of the incident, Orlando and defendant's little brother attempted to call defendant multiple times.

---

[10] Juan also testified that he told law enforcement some of the money in the house belonged to his sister.

6.

## DISCUSSION

**I.     There is Substantial Evidence of the Robbery Against Gloria (Count 3)**

On appeal, defendant contends there is insufficient evidence to support defendant's conviction for robbery against Gloria.  Specifically, defendant argues there is insufficient evidence for a jury to conclude Gloria possessed Juan's drug money at the time it was stolen.  We disagree.

### A.     *Standard of Review*

" 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – evidence that is reasonable, credible and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence .…  "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.]  We do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)  "In our limited role on appeal, '[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 161–162.)

### B.     *Applicable Law*

"Robbery is defined in section 211 as 'the felonious taking of personal property in the possession of another, from his [or her] person or immediate presence, and against his [or her] will, accomplished by means of force or fear.' " (*People v. Scott* (2009)

7.

45 Cal.4th 743, 749 (*Scott*).) "A person from whose immediate presence property was taken by force or fear is not a robbery victim unless, additionally, he or she was in some sense in possession of the property. 'It has been settled law for nearly a century that an essential element of the crime of robbery is that property be taken from the possession of the victim.' " (*Ibid.*)

Possession may be actual or constructive. "A person who owns property or who exercises direct physical control over it has possession of it, but neither ownership nor physical possession is required to establish the element of possession for the purposes of the robbery statute. [Citations.] '[T]he theory of constructive possession has been used to expand the concept of possession to include employees and others as robbery victims.' [Citation.] Two or more persons may be in joint constructive possession of a single item of personal property, and multiple convictions of robbery are proper if force or fear is applied to multiple victims in joint possession of the property taken." (*Scott*, *supra*, 45 Cal.4th at pp. 749–750, fn. omitted.)

"For constructive possession, courts have required that the alleged victim of a robbery have a 'special relationship' with the owner of the property such that the victim had authority or responsibility to protect the stolen property on behalf of the owner." (*Scott*, *supra*, 45 Cal.4th at p. 750.) " '[I]t is enough that the person presently has some loose custody over the property, is currently exercising dominion over it, or at least may be said to represent or stand in the shoes of the true owner.' " (*People v. DeFrance* (2008) 167 Cal.App.4th 486, 497.)

Cases recognizing constructive possession to support a robbery conviction outside the employment context have generally involved family members. (See, e.g., *People v. Gordon* (1982) 136 Cal.App.3d 519 [parents robbed or drugs and cash belonging to their adult son].) In *Gordon*, although neither parent knew of the marijuana or $1,000 taken from their son's bag, the court explained, "[P]arents have at least the same responsibility to protect goods belonging to their son who resides with them in their home." (*Ibid.*)

8.

Moreover, in *People v. Weddles* (2010) 184 Cal.App.4th 1365, 1372 (*Weddles*), the court upheld two counts of robbery against two brothers who did not live together. In *Weddles*, the other brother (Armando) did not live at his brother's (Alex) apartment, but "regularly visited." (*Ibid.*) During the ensuing robbery, the defendants held a gun to the Armando's head repeating, " ' "Where's the money, where's the money …. We'll shoot you, we'll pop you." ' " (*Id.* at pp. 1368–1369.) Armando knew where Alex stashed his money and was able to lead the robbers "to the bedroom, where he pointed out the jar[] [and] [t]he robbers took $1,500 in cash from the hiding place." (*Id.* at p. 1369.)

The *Weddles* court explained, "Although Armando did not live in Alex's apartment, he had a close connection to Alex. Not only was Armando his brother, but Armando was also sufficiently close to Alex that he knew where Alex kept his hidden savings. Armando had a special relationship with Alex that conferred him with constructive possession of Alex's personal property in the apartment." (*Weddles*, *supra*, 184 Cal.App.4th at p. 1371.) Additionally, in *People v. DeFrance*, *supra*, 167 Cal.App.4th 486, a mother had implied authority over her son's car because she "helped her son buy it, had access to the keys, had driven it, and was named on the insurance." (*Id.* at p. 499.) The mother was no mere bystander to the car, but instead had a possessory "connection" to it. (*Ibid.*)

### C. *Analysis*

Defendant contends there was insufficient evidence for the jury to conclude Gloria constructively possessed the drug money because there lacked sufficient evidence Juan "had granted Gloria some right to control or protect his drug money." We disagree.

*People v. Hutchinson* (2018) 20 Cal.App.5th 539 (*Hutchison*) is instructive. In *Hutchison*, the defendant and three other men entered a residence and proceeded to rob a family of "jewelry, including cuff links, watches, necklaces, and a bracelet, as well as two $50,000 cashier's checks …." (*Id.* at pp. 543–545.) One of the robbery victims was the parents' 15-year-old daughter. (*Id.* at p. 543.) The defendant was subsequently

convicted of five counts of robbery (*id.* at p. 542) and argued on appeal his robbery conviction against the 15-year-old daughter should be vacated because there was insufficient evidence to establish the daughter had either actual or constructive possession of any property that was taken from the residence. (*Id.* at p. 546.) The court disagreed because the daughter "lived at the residence, was present inside the home during the entire robbery, and, as with the other victims, was physically assaulted and restrained in order to prevent her from interfering with the crime's commission." (*Id.* at p. 547.) Specifically, the court reasoned:

> "First, we observe that the jury may have reasonably found that some of the property taken belonged to [the daughter] personally given that her mother testified that watches belonging to her daughters were stolen. Second, '[c]onstructive possession does not require an absolute right of possession.' [¶] … Given that one need not own or have a legal right to the property in order to have possession of it, [citation], as well as the codified special relationship between [the daughter] and her parents,[11] we decline to hold that [the daughter] could not be deemed a robbery victim. Unarguably, in effecting the theft of property, [the] defendants subjected [the daughter] to the same force and intimidation as her other family members. We see no rational basis to conclude that a minor's constructive possession of or possessory interest in her family's property is nonexistent if majority members of her family are present." (*Id.* at p. 549.)

Similarly, here, substantial evidence supports the determination that Gloria constructively possessed the drug money under the special relationship doctrine. Although Juan testified that he lived alone, he further testified that he dated Gloria for two or three years and that she was staying at the house when the robbery occurred. On the night of the robbery, Juan came home and placed $10,000 or $12,000 in drug money in plain view on the kitchen counter, while Gloria watched television. Thereafter, Orlando and Victor entered the house, and Juan began struggling with Orlando. At this

---

**11** The *Hutchison* court referred to Civil Code section 50, which states, "Any necessary force may be used to protect from wrongful injury the person or property of oneself, or of a spouse, child, parent, or other relative, or member of one's family, or of a ward, servant, master, or guest." (*Hutchison*, *supra*, 20 Cal.App.5th at p. 547, fn. 4.)

point, defendant and William rushed in and William pointed a gun at Gloria, grabbed her, and threw her to the ground, presumably to get her under control. Eventually, defendant and his coparticipants ran off, and officers later found a "wad or bundle of case in the middle of the [house's] lawn," which was later picked up by Gloria and stashed in her pocket. Irrespective of Juan's credibility issues and the conflicting evidence, it was reasonable for the jury to infer Gloria "lived at the residence, was present inside the home during the entire robbery, and, as well with the other victim[], was physically assaulted … to prevent her from interfering with the crime's commission." (*Hutchison*, *supra*, 20 Cal.App.5th at p. 547; see *People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 162 [" 'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' "].) Additionally, it was reasonable for the jury to conclude Gloria had constructive possession over the money based on the money being in plain view on the kitchen counter during the commission of the robbery, along with Gloria's subsequent actions of picking up the wad of money off the lawn and placing it in her pocket. Moreover, Juan's assertion that some or all of it was Gloria's money – whether truthful or not – could contribute to the jury inferring that she had constructive possession.

Nonetheless, defendant cites *People v. Ugalino* (2009) 174 Cal.App.4th 1060 (*Ugalino*) for the proposition the prosecution failed to establish Gloria had possession of the drug money.[12] The *Ugalino* court concluded insufficient evidence existed to support his robbery conviction against the victim's roommate because there "lack[ed] any evidence that the roommate owned, had access to, control over, or an obligation" to protect the stolen property. (*Id*. at p. 1065.) In *Ugalino*, the defendant went into the apartment to steal marijuana, "aimed a gun [at the victim], and said, 'you're getting

---

[12] Defendant further directs this court to *People v. Galoia* (1994) 31 Cal.App.4th 595 in support of his argument. However, *Galoia* is unpersuasive because it involved a store robbery where a customer was present. (*Id*. at pp. 596–597.) The court concluded the customer "was not an employee or agent of the convenience store[,] [n]or was he in any way responsible for the security of the items taken" (*id*. at p. 597), and therefore, the defendant's robbery conviction against the customer was dismissed. (*Id*. at p. 599.)

jacked.' " (*Id*. at pp. 1062–1063.)  The defendant then "pointed it at [the roommate], telling [the roommate] to lie facedown on the ground." (*Id*. at p. 1063.)  The court concluded the defendant could not be convicted of robbery against the roommate because:

> "The evidence at trial established [the] defendant attempted to steal marijuana from [the victim], saying, 'you're getting jacked[.]'  'Give [me] the weed.'  It was undisputed that [the roommate] did not have actual possession of the marijuana, and [the victim] stored the marijuana locked in a safe in his bedroom.  There was no evidence [the roommate], who had been living with [the] defendant for only three to four months, had access to the safe.  In fact, [the roommate] did not even have a key to the apartment, most of the time coming and going only when someone else was home."  (*Id*. at p. 1065.)

*Ugalino* is distinguishable.  First, the drug money was in plain view on the kitchen counter and not "locked in a safe in [the] bedroom," (*Ugalino*, *supra*, 174 Cal.App.4th at p. 1065), which implies Gloria had access to the money prior to and during the commission of the robbery.  Second, unlike the roommate victim in *Ugalino* who "did not even have a key to the apartment, most of the time coming and going only when someone else was home," (*ibid.*), Juan and Gloria had been dating for two or three years.  Additionally, Gloria had a suitcase in one of the bedrooms and answered the door letting Victor and Orlando inside the house, all of which established a level of dominion and control over the house.  Accordingly, we conclude substantial evidence exists to support defendant's conviction of robbery against Gloria (count 3) because there was " ' "evidence that is reasonable, credible and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' "  (*People v. Nelson*, *supra*, 51 Cal.4th at p. 210.)

## II.     Defendant Forfeited His Claim of Prosecutorial Misconduct and Failed to Establish Ineffective Assistance of Counsel for Failure to Object to the Alleged Prosecutorial Misconduct

Defendant further contends the prosecutor committed prejudicial misconduct during his closing argument by inferring there were three screwdrivers used during the

12.

robbery because the evidence did not support such an inference. We conclude trial counsel's failure to object and request a curative admonition forfeited his claim on appeal. (See *People v. Fayed* (2020) 9 Cal.5th 147, 204 (*Fayed*).) In the alternative, even if we conclude trial counsel's performance fell below an objective standard of reasonableness, defendant did not suffer prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694 (*Strickland*).)

### A.     *Additional Factual Background*

#### 1.     Closing Arguments

The prosecutor stated the following during his closing argument:

> "Last witness the defense called from the Department of Justice said the screwdrivers number 12, and screwdriver number 14 didn't have any victims' DNA on it, so it's not consistent with being stabbed with a screwdriver. That wasn't the defendant's screwdriver, ladies and gentlemen. That's a distraction.

> "Whose screwdriver was number 14? That was William's screwdriver right where he was jumping over the counter, firing his gun from. He came in armed with a screwdriver, fell out of his pocket. Orlando's screwdriver, Joe's screwdriver. Right next to him there in that picture, Exhibit 120. That was his screwdriver. The one that the defendant had he took with him when he fled. Again, distraction."

The prosecutor continued by arguing, "[T]hat's when William … had jumped over the counter … right next to the screwdriver that he dropped that he was carrying. Again, screwdriver 12 and 14, those weren't [defendant's] screwdrivers. That's a distraction."

Trial counsel stated the following during his closing argument:

> "And then the most important evidence in this case, the screwdrivers. So I gather from [the prosecutor's] argument that the plan as he sees it was to all three be armed with screwdrivers, which is a dumb plan. It's also completely fantasy and conjecture. There's not a single shred or piece of evidence that you heard from the witness stand that supports that. And that is evidence of how awful this case is. That's how awful this case is, because in order to tell a coherent story about what happened, they just have to make it up. Oh, yeah. There's a third

screwdriver. He took it with him, obviously, because that's the only way the evidence fits. [¶] … [¶]

"[Detective] Sanchez testified that he sat through other hearings where Juan … did the same thing. Nobody at any point at any part of this trial has said anything about a third screwdriver, much less anything about a second person, other than [defendant], being armed with a screwdriver. It's pure, pure fantasy. But it's the fantasy that you have to concoct in your [head] in order to fit the DA's theory together, because, folks, those screwdrivers had no blood on them, no fibers on them. They had no DNA significance on them. And you heard Sarah P[.], a scientist with the Department of Justice, tell you that's not consistent with a screwdriver that just stabbed somebody.

"Juan … planted that screwdriver there to support his story. That's what happened. He grabbed a screwdriver out of a drawer somewhere, threw it on the ground, and said 'Oh, they stabbed me with a screwdriver,' because there was absolutely no evidence to suggest that he was stabbed with a screwdriver. And the evidence that is on the scene does not in any way, shape, manner, or form corroborate. The only thing you can do is create a third screwdriver out of nowhere to make Juan['s] story fit.

"And remember what happened we questioned about the screwdriver. I questioned Juan … about the screwdriver. Is that the screwdriver? Yeah. That's the screwdriver. Show you previous where you've identified this as the screwdriver. Yes. That's [the] screwdriver.

"Did the [prosecutor] ask any questions calling into question whether or not that was the screwdriver, saying hey, are you sure it was the screwdriver? Might there have been a different screwdriver? Did he ask any questions about the screwdriver of Juan … ? No. What about when [Detective] Sanchez was up there and I was asking him, 'Hey, did Juan … say anything about the screwdriver? Did he ask [Detective] Sanchez?' Well, was there any equivocalness – that's not a word – did he equivocate? Did he say maybe it was a different screwdriver? There was no questioning by the DA on the subject of the screwdriver and whether or not that was the screwdriver that, in fact, stabbed Juan .…

"After Sarah [P.] testifies, though, there's got to have been a third screwdriver, man. Has to have been. That's how critically damning that piece of evidence is for this case. If you remember, two pieces of evidence when you go back in the jury room, the screwdrivers and the target phone. Absolutely demolish, devastate, and destroy the case that the DA is trying to present to you."

14.

### 2. Proceedings After the Trial

Following the trial, trial counsel stated the following on the record, "Whatever the Court would like to do. I think it's abundantly clear that I rendered ineffective assistance in [defendant's] trial, and that needs to be addressed by other counsel." The trial court asked trial counsel if he in fact rendered ineffective assistance of counsel and trial counsel replied, "Yes."

At a subsequent *Marsden*[13] hearing, trial counsel stated:

" … I didn't miss what [the prosecutor] said about the fact that somebody brought in another screw driver. I got that loud and clear. What I missed was the fact that that argument is, in fact, misconduct by the prosecutor. And I missed the objection to that argument. So I argued it, because I had to argue it. However, it would have been to [defendant's] advantage clearly to have the Court sustain an objection, admonish the prosecutor, and instruct the jury to disregard that argument."

The trial court responded:

"I think out of an abundance of caution, it probably would – in fairness to [defendant], it probably would be best – I'm not saying that I'm finding at this point what he did rose to the level of ineffective assistance of counsel; I want to make that clear on the record, because once – if that finding is made, then I have to report it to the State Bar and all that stuff. But out of an abundance of caution, I think it would be good to have another attorney take over this – she'll have to be appointed for all purposes."

New counsel then filed a motion for a new trial alleging both prosecutorial misconduct regarding the prosecutor's misstatements about the screwdrivers and ineffective assistance of counsel because trial counsel failed to object to these statements. The People then filed an opposition to defendant's motion for a new trial. At the motion for a new trial hearing, the trial court concluded:

"And in analyzing this case, the Court does find that the district attorney did refer to facts that were not in evidence. And there were some mischaracterization. He stated that a screwdriver fell out of William['s] pocket, however, the Court could not find any such testimony and also

---

[13] *People v. Marsden* (1970) 2 Cal.3d 118.

made comment that [] defendant had a third screwdriver and took it with them.

> "And the Court does not find that these were reasonable inferences to be drawn from the evidence, and they're not the type of matters that would be considered common knowledge or illustrations drawn from common experience, history, or any sort of reasonable inference in the Court's mind. And frankly had an objection been made, I would have sustained it and admonished the jury."

However, the trial court concluded "in reviewing the closing arguments as whole, the screwdriver's [*sic*] were only part of the evidence [¶] [a]nd so as to the claim of constitutional due process violation, there's no pattern of conduct so egregious that it [infects] the trial with unfairness." Additionally, the trial court stated, "And as to the state claim, I don't find that this rises to the level of deception or reprehensible methods to persuade a jury[] [and] [w]hile I do find it to be improper argument, I do not find that it constitutes prosecutorial misconduct." Lastly, the trial court did not find ineffective assistance of counsel because trial counsel "did overall a very good job of representing [defendant]" and there was not "anything about his representation [that] fell below any objective standard of reasonableness." The trial court denied the motion for a new trial.

## B. *Defendant Forfeited His Prosecutorial Misconduct Claim by Not Objecting at Trial*

### 1. Applicable Law

Prosecutorial misconduct exists " 'under state law only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Earp* (1999) 20 Cal.4th 826, 858.) In more extreme cases, a defendant's federal due process rights are violated when a prosecutor's improper remark(s) " ' " 'infect[s] the trial with unfairness,' " ' " making it fundamentally unfair. (*Ibid.*) For example, it is prosecutorial misconduct to both misstate the law, (*People v. Cortez* (2016) 63 Cal.4th 101, 130), and to misstate the evidence or go beyond the record. (*People v. Gonzales* (2011) 51 Cal.4th 894, 947; *People v. Davis* (2005) 36 Cal.4th 510, 550.) However, the prosecution "enjoys wide latitude in commenting on the evidence,

16.

including the reasonable inferences and deductions that can be drawn therefrom." (*People v. Hamilton* (2009) 45 Cal.4th 863, 928; see *People v. Rowland* (1992) 4 Cal.4th 238, 277 ["hyperbolic and tendentious" comments, even if "harsh and unbecoming," may be reasonable if they can be inferred from the evidence].) "A defendant asserting prosecutorial misconduct must … establish a reasonable likelihood the jury construed the remarks in an objectionable fashion." (*People v. Duff* (2014) 58 Cal.4th 527, 568.) "To preserve a claim of prosecutorial misconduct on appeal, ' "a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety. [Citations.]" [Citation.] The failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would have not cured the harm.' " (*Fayed*, *supra*, 9 Cal.5th at p. 204.)

### 2. Analysis

Here, trial counsel did not object to the prosecutor's statements during closing argument and made no request the jury be admonished. Although " '[t]he failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would have not cured the harm,' " (*Fayed*, *supra*, 9 Cal.5th at p. 204), defendant has not established that an objection or admonition would have been futile. Indeed, as the trial court subsequently stated, "[H]ad an objection been made, [the trial court] would have sustained it and admonished the jury." Thus, an objection would not have been futile, and we therefore conclude defendant may not pursue the issue of prosecutorial misconduct on appeal because the issue has been forfeited.[14]

---

[14] In his reply brief, defendant contends for the first time that the People's statements in their opening brief, "the lack of DNA evidence could show that [Juan] was lying about being stabbed with a screwdriver" "a third screwdriver was used by [defendant] and that screwdriver was not left both at the scene," established the prosecutor committed misconduct by eliciting false testimony at trial because the prosecutor had a duty of candor to correct Juan's testimony if he believed Juan was lying or mistaken. Defendant argues that because the prosecutor presented false testimony, this court should review prejudice under the *Chapman v. California* (1967) 386 U.S. 18 standard. We disagree. First, and most importantly, "a point raised for the first time [in a

17.

**C.** ***Defendant has Failed to Establish Trial Counsel was Ineffective for Failing to Object to the Alleged Prosecutorial Misconduct***

Defendant acknowledges his claims of prosecutorial misconduct may have been forfeited because his trial counsel failed to object and request a jury admonishment. Therefore, in the alternative, defendant contends his trial counsel was ineffective for failing to object. As we shall explain, we reject defendant's claim for ineffective assistance of counsel.

### 1. Applicable Law

Defendant has the burden of proving ineffective assistance of counsel. (*People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048.) To establish such a claim, a defendant must show (1) his counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's error, a different result would have been reasonably probable. (*Strickland*, *supra*, 466 U.S. at pp. 687–688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.)

"Because of the difficulties inherent in making the evaluation [of counsel's performance], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; … the challenged action 'might be considered sound trial strategy.' " (*Strickland*, *supra*, 466 U.S. at p. 689.) Moreover, " ' " 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' " ' " (*People v. Holt* (1997) 15 Cal.4th 619, 703.)

---

reply brief] therein is deemed waived and will not be considered, unless good reason is shown for failure to present it before," (*People v. Baniqued* (2000) 85 Cal.App.4th 13, 29), and therefore, this argument is waived on appeal. Second, even assuming the prosecutor committed misconduct by "present[ing] false testimony," this argument is still waived by trial counsel's failure to object in the trial court, (*Fayed*, *supra*, 9 Cal.5th at p. 204), and as we discuss below defendant was not prejudiced by trial counsel's failure to object.

## 2. Analysis

Even if trial counsel's failure to object fell below an objective standard of reasonableness, there was not a reasonable probability that the result of the proceeding would have been different but for counsel's deficient performance. (*Strickland*, *supra*, 466 U.S. at pp. 687–688.) First, there was ample evidence to establish defendant guilty of robbery and burglary against Juan. Apart from Juan's testimony about the robbery and burglary, Tiffany testified that William, defendant, and defendant's little brother were all together before the crimes and stopped in a residential neighborhood. At or around the time the robbery and burglary occurred Tiffany heard what she believed to be "[e]ither gunshots or fireworks" and then observed William run back into the car with a wad of cash and frantically state, " '[M]ove, move, move' " and " '[t]he house lick went bad.' " Later, William told Tiffany to remove a piece of paper covering the entire license plate, which she ended up doing.

Subsequently, law enforcement arrived and located a "wad or bundle of cash in the middle of the lawn," a .45-caliber handgun, and evidence of use of a nine- millimeter handgun, Orlando dead in the kitchen on top of a rifle, pools of blood leading out to the garage, and two screwdrivers, one with a shaved tip. All this evidence corroborated the testimony surrounding the robbery and burglary. The jury may have believed Juan's testimony because of this corroborating evidence, irrespective of his credibility issues.

Second, the jury was properly instructed they alone were to judge the evidence and determine whether defendant was guilty beyond a reasonable doubt. (See *People v. Pearson* (2013) 56 Cal.4th 393, 414 ["We presume that jurors understand and follow the court's instructions"].) The trial court instructed the jury, "[y]ou must decide what the facts are [] [and] [i]t is up to all of you, and you alone to decide what happened based only on the evidence that has been presented to you in this trial" (CALCRIM 200) and " '[e]vidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else [the trial court] told you to consider as evidence … [and] [i]n their

19.

opening statements and closing arguments, the attorneys discuss the case, *but their remarks are not evidence*" (CALCRIM No. 222).  (Italics added.)  Lastly, the jury was instructed that "[i]n deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all evidence that was received throughout the entire trial" (CALCRIM No. 220).  Accordingly, even assuming trial counsel's performance did fall below an objective standard of reasonableness, it was not reasonably probable defendant would have obtained a different result.

## DISPOSITION

For the foregoing reasons, the judgment is affirmed.


POOCHIGIAN, J.

WE CONCUR:


HILL, P. J.


DE SANTOS, J.


20.